J-A03032-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF PAUL A. GARDNER, SR. DECEASED | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: PAUL A. GARDNER, JR. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 464 MDA 2020 |

Appeal from the Order Entered February 12, 2020
In the Court of Common Pleas of Montour County Orphans' Court
Division at No(s): 25-OC-2018

BEFORE: LAZARUS, J., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY LAZARUS, J.:         **FILED: JULY 8, 2021**

Paul A. Gardner, Jr., Executor of the Will of Paul A. Gardner, Sr., Deceased ("Decedent"), appeals from the order, entered in the Court of Common Pleas of Montour County, Orphans' Court Division, holding that certain items of personal property belonged to Appellee, Tina M. Randello. Upon careful review, we affirm.

Paul A. Gardner, Sr. ("Decedent"), and Randello were married on March 4, 2012, after cohabiting for approximately seven years. Prior to their marriage, the couple executed a prenuptial agreement ("Agreement"), pursuant to which they each agreed to waive all claims to the separate property of the other upon divorce or separation. Specifically, the Agreement provides, in relevant part, as follows:

> § 1.03. The Parties intend by this Agreement to confirm that all property owned by each prior to their marriage as the separate property of that Party.

. . .

§ 3.01(b). Except as otherwise provided in this Agreement, [Decedent] shall keep and retain the sole ownership, control[,] and enjoyment of all of his property, free and clear of any claim by [Randello], including, without limitation, any claim of dower or equitable distribution[,] and he shall have the exclusive right to dispose (during his lifetime or by [w]ill) of such property[,] without interference or restraint by [Randello] in like manner as if the marriage had not taken place and he had remained unmarried.

§ 3.01(c). Notwithstanding anything in this Agreement to the contrary, neither party shall have any interest in the business or assets of the other, the proceeds or the partial or complete sale of the business or assets owned by the other or any assets acquired in exchange for the partial or complete sale of the other party's business and/or its assets.

§ 3.02. All wages, salary, and income of any kind of each Party earned or received during the marriage, shall be the separate property of that Party.

§ 3.03. The full value of any property acquired during marriage by a Party that is acquired with the proceeds of separate property pursuant to any sale, other disposition, or change in form of separate property shall remain the separate property of that Party. The full value of all property that either Party may acquire by way of gift or inheritance, whether from spouse or third parties, whether under a [w]ill or by intestate distribution, is similarly the property of the owner-party.

. . .

§ 3.06. Each party shall have the absolute and unrestricted right to manage, control, dispose of, or otherwise deal with his or her separate property

. . .

§ 4.04. At the death of either Party, his or her separate property acquired prior to the date of the marriage as set forth in Exhibits "A" and "B" to this Agreement, together with all income and proceeds from increases in value of, and other property acquired in exchange for any such separate property, shall pass to his or her children or their heirs free from any claim from the other

Party. Each Party hereby waives any and all claim they may have against the Estate of the other[,] whether based on a right to take an elective share against a Will, a right under the law of intestacy, or any other right created by law.

. . .

§ 5.03. All household furnishings separately or joint [sic] held in Paul A. Gardner, Sr. not otherwise specifically bequeathed or gifted in his Will shall become the separate property of Tina M. Randello in the event of a permanent separation or divorce of the parties.

Prenuptial Agreement, 2/10/12. Appended to the Agreement were two exhibits listing the major assets of each party. Neither party included any household furnishings or specific items of personalty on their asset disclosure; Decedent generally disclosed "personal property" with an aggregate value of $350,000.

Decedent executed a will on November 4, 2013, pursuant to which he appointed his son, Paul A. Gardner, Jr., as executor. Under the terms of his will, Decedent gave Randello certain items of personal property—listed at Schedule I to the will—for her use and benefit so long as she remained living full-time in the marital residence, or until her death, whichever occurred first. Decedent also gave Randello the funds remaining in two investment accounts and reiterated her entitlement to his Heller's Gas 401(k) retirement account, on which she was the named beneficiary. Decedent made numerous bequests of various business, financial, personal, and real property to his sons; the remainder of Decedent's estate was to pass to Randello.

At some point in 2017, Decedent's health deteriorated. A dispute subsequently arose between Randello and Decedent's family over the validity of a power of attorney, allegedly executed by Decedent, naming Randello as his agent and "transferring management and control of [Decedent's] personal care and control of his considerable assets from his current agent, Paul A. Gardner, Jr., to Randello." Brief of Appellant, at 12. As a result of that dispute, Decedent's children filed a guardianship petition in the Montour County Orphans' Court. The guardianship action was ultimately withdrawn pursuant to a Confidential Stipulation ("Stipulation"), approved by the court, in which the parties agreed that the challenged power of attorney was void and of no effect and that the Agreement remained in full force and effect. The parties further stipulated that, "[a]s of the effective date hereof[,] only the following assets . . . are held jointly by [Randello] and [Decedent]: P&T Realty LLC [and] Town Home, Danville, PA." Confidential Stipulation, 4/27/18, at ¶ 1 (unnecessary capitalization omitted). The Stipulation also provided that, upon Decedent's death, Randello would receive 25% of Decedent's Scottrade account, which was initially to be divided equally among Decedent's three children under the terms of Decedent's will.

Decedent died on May 18, 2018, leaving an estate worth approximately $80 million; his will was duly probated and Executor was granted letters testamentary. The will's tax clause required all death taxes to be paid from the residuary estate. Decedent's children have paid the taxes owed by the estate; however, the taxes owed exceeded the value of the residuary estate,

and it is the Executor's intent to reimburse himself and his siblings by liquidating the property that would have otherwise passed to Randello via the residuary clause. As a result, the instant dispute arose over the ownership of much of Decedent's personal property.

On July 16, 2018, Executor filed a "Petition of Executor for Access to the Tangible Personal Property Owned by the Estate of Paul A. Gardner, Sr., for Proper Inventory in Accordance with the Pennsylvania Estate and Fiduciaries Code." In that petition, Executor sought access to the marital home[1] to conduct an inventory of all Decedent's personal property located within the residence, including the content of two safes kept at the property. Randello filed preliminary objections to the petition, which the court denied following a hearing on August 17, 2018. The court appointed Dustin Snyder as the court's representative, "to conduct and document and inventory all personal property located at [the marital residence] in which the estate claims an interest[.]" Trial Court Order, 8/17/18, at ¶ 1. The inventory was ultimately conducted; on May 21, 2019, the court, following a conference with counsel, issued an order directing the parties to exchange lists of personal property claimed by each party, followed by a list of any objections to the other party's list.

Following receipt of Randello's list of claimed property, Executor filed a "Motion to Enforce Terms of [Decedent's Will, the Agreement, and the Stipulation]," asserting that Randello's claims to certain items of personalty

---

[1] Randello owned the marital home prior to her relationship with Decedent and continues to be the sole owner of that property.

violated the terms of the three referenced documents and that Randello had waived all claims to property purchased by Decedent with his own funds. Executor requested that the court "confirm" the terms of the three documents by finding that: (1) property acquired by Decedent prior to his marriage to Randello is Decedent's separate property, free of all claims by Randello; (2) property acquired by and/or titled in the name of Heller's Gas is the property of that entity, free of all claims by Randello; (3) property purchased by Decedent during the marriage with Gardner's separate property or income is Decedent's property, free of all claims by Randello; (4) property acquired by or with income generated by joint property—specifically, P&T Realty, LLC, and Town Home, Danville, PA—or in exchange for property owned by those entities is the sole and separate property of Randello, free from any claims by the estate; and (5) property purchased by Randello during the marriage with Randello's separate property or income is Randello's, free of all claims by the estate. *See* Motion to Enforce, 8/22/19, at [7].

The court held multiple hearings, during which the parties disputed their claims to innumerable pieces of personal property, including such items as a walking stick, zebra throw pillows, cigar cutters, a frosted cup, laser pointers, flashlights, and porcupine quills.[2] Of particular relevance to this appeal, the

---

[2] Aptly, the Honorable Thomas A. James, Jr., related the following anecdote prior to the first hearing in this matter:

*(Footnote Continued Next Page)*

parties disputed ownership of approximately 1,400 bottles of California wine and wine racks. Executor argued that Decedent—individually or with his corporate credit card—paid for the wine and, therefore, pursuant to the terms of the Agreement, it is the property of the estate. Randello argued that, although paid for by Decedent, the wine was purchased as a couple, and they "drank it, . . . entertained [with it], . . . gave it away for gifts for Christmas, for Thanksgiving. . . . It was something [they] enjoyed together." N.T. Hearing, 12/27/19, at 10. Therefore, Randello asserts, the wine should be considered entireties property that passes to Randello. Similarly, the parties disputed the ownership of three paintings by the artist Craig Bone. Executor asserted that Decedent paid for them with $50,000 of his own money prior to the marriage and, therefore, they are the property of the estate. Randello claimed that the paintings were "[their] first purchase that [they] ever bought together" and that she paid Decedent in cash for half the value of the paintings after he paid the artist using his credit card. N.T. Hearing, 12/20/19, at 206. Finally, Executor argued that a Kubota mower and rough terrain vehicle ("RTV") were purchased—prior to the marriage—by Decedent's business for

---

> [W]hen I was doing divorces . . . I remember walking out the door here with my client and we're arguing about personal property. We came down to a blender and I said to my client, I reached into my pocket, gave her $20.00 and said, "Go buy the damn blender. I'm not arguing anymore." Now, this is that case on super-duper steroids.

N.T. Hearing, 6/13/19, at 4.

yard care at the property shared by Decedent and Randello. Randello claimed that Decedent purchased the RTV for her to replace a four-wheeler because "[h]e felt it was safer," and that she used it to haul mulch and work outside at her property. N.T. Hearing, 12/27/19, at 4. Similarly, Randello asserted that Decedent purchased the Kubota mower to replace a tractor that she had owned because the Kubota "made it easier to mow the grass." *Id.* at 5.

Following the final hearing, the Orphans' Court issued an order on February 11, 2020, in which it disposed of the various items disputed by the parties. The court determined, *inter alia*, that Randello was entitled to the above-specified items, i.e., the wine, paintings, and lawn equipment. The Executor filed a motion for reconsideration/exceptions, which the court denied on March 12, 2020. Executor filed a timely notice of appeal, followed by a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Executor raises the following claims for our review:

1. Did the [Orphans' Court] commit an error of law and/or an abuse of discretion by ruling that ownership of an RTV and Kubota mower passed to Randello upon [Decedent's] death when these items were (a) purchased with [Decedent's] business assets and (b) the RTV was purchased years before the marriage and the parties were bound by a prenuptial agreement wherein Randello waived all claims to [Decedent's] premarital and business property?

2. Did the [Orphans' Court] commit an error of law and/or an abuse of discretion by ruling that ownership of a collection of 1,400+ bottles of wine and wine racks passed by operation of law to Randello upon [Decedent's] death despite the fact that these items were purchased by [Decedent] with his separate property and their prenuptial agreement waives all claims by Randello to assets purchased by [Decedent's] separate property?

3. Did the [Orphans' Court] commit an error of law and/or an abuse of discretion by ruling that ownership of three Craig Bone paintings purchased by [Decedent] before the marriage passed by operation of law to Randello upon the death of [Decedent] despite the fact that (a) Randello waived all claims to [Decedent's] premarital property in their prenuptial agreement and (b) a confidential stipulation agreement between [Decedent] and Randello (dated one month prior to [Decedent's] death) confirmed the subject paintings were not "jointly held assets"?

4. Did the [Orphans' Court] commit an error of law or an abuse of discretion in accepting Randello's uncorroborated testimony that she allegedly paid [Decedent] $25,000 cash for a joint interest in the Craig Bone artwork as "clear and convincing evidence" to overcome the express terms of the prenuptial agreement and the confidential stipulation executed one month before [Decedent's] death which confirmed the subject artwork was not a joint asset?

Brief of Appellant, at 9.

We begin by noting that our standard of review of the findings of an Orphans' Court is deferential.

> When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion.
>
> However, we are not constrained to give the same deference to any resulting legal conclusions.
>
> *In re Estate of Harrison*, 745 A.2d 676, 678–79 (Pa. Super. 2000) [] (internal citations and quotation marks omitted). "The Orphans' Court['s] decision will not be reversed unless there has been an abuse of discretion or a fundamental error in applying the correct principles of law." *In re Estate of Luongo*, 823 A.2d 942, 951 (Pa. Super. 2003)[.]

*In re Fiedler*, 132 A.3d 1010, 1018 (Pa. Super. 2016) (citation omitted).

Executor's claims are all grounded in the terms contained in the Agreement.

> Prenuptial agreements are contracts and should be interpreted using contract principles. **Raiken v. Mellon**, [] 582 A.2d 11, 13 ([Pa. Super.] 1990).
>
> "When interpreting a prenuptial agreement, the court, as in dealing with an ordinary contract, must determine the intention of the parties.   When the words of a contract are clear and unambiguous, the intent of the parties is to be discovered from the express language of the agreement."  **Id.**  "The court must construe a contract as written and may not modify the plain meaning of the contract under the guise of interpretation." **Tuthill v. Tuthill**, 763 A.2d 417, 420 (Pa. Super. 2000)[.] However, where an ambiguity exists, "the courts are free to construe the terms against the drafter and to consider extrinsic evidence in so doing."  **Raiken**, 582 A.2d at 13.  If a contract "is fairly susceptible of different constructions and capable of being understood in more than one sense[,]" it will be found to be ambiguous.  **Tuthill**, 763 A.2d at 420.  "It is the function of the court to decide, as a matter of law, whether the contract terms are clear or ambiguous.  The fact that the parties have different interpretations of a contract does not render the contract ambiguous."  **Id.** (citations omitted).

**In re Estate of Blumenthal**, 812 A.2d 1279, 1286 (Pa. Super. 2002).

Executor first asserts that the Orphans' Court erred and/or abused its discretion in determining that Decedent purchased the RTV and mower as gifts for Randello to replace a machine or machines previously used by Randello to maintain her property.  Executor argues that, because Decedent paid for the machines with his Heller's Gas credit card prior to the couple's marriage, Randello waived any claim to it under the terms of the Agreement, which provides that any property acquired by Decedent prior to marriage remains his sole and separate property.  **See** Agreement, **supra** at §§ 1.03, 3.01(b)-

(c), and 4.04.  Randello asserts that the machines were gifts from the Decedent to her and are, therefore, her property.  Executor is entitled to no relief on this claim.

The existence of a valid prenuptial agreement does not prohibit subsequent *inter vivos* gifts and testamentary bequests to a surviving spouse.  **See In re Hillegass' Estate**, 244 A.2d 672, 676 (Pa. 1968).  Indeed, the Agreement signed by the parties contemplates the possibility of gifts given from one spouse to the other.  **See** Agreement, **supra** at §§ 3.03 ("The full value of all property that either Party may acquire by way of gift . . ., whether from spouse or third parties, . . . is similarly the separate property of the owner-party.") and 6.05 ("Nothing in this Agreement shall affect the right of either Party voluntarily to transfer real or personal property to the other Party with or without consideration or the right of either Party to receive property transferred by the other Party during his or her lifetime.").

> Generally, the burden of proving an *inter vivos* gift is placed initially on the putative donee.  **See In re Estate of Pappas**, [] 239 A.2d 298, 300 ([Pa.] 1968).  The putative donee must show a *prima facie* case through clear, direct and convincing evidence that an *inter vivos* gift has taken place.  **Id.**  Once a *prima facie* case is established by the putative donee, a presumption of the validity of the gift arises, then the burden shifts to the contestant to show by clear and convincing evidence that the property in question was not given as an *inter vivos* gift.  **Id.**

**Lanning v. West**, 803 A.2d 753, 761 (Pa. Super. 2002).  Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without

hesitancy, of the truth of the precise facts in issue." **In re Adoption of L.J.B.**,

18 A.3d 1098, 1107 (Pa. 2011).

Here, the Orphans' Court credited the following testimony of Randello[3]

regarding the lawn care machines:

Q: Okay. Tina, on the first page is an RTV 500 camo gas . . .
vehicle. Can you tell the court how that arrived at your house and
how that was used?

A: Yes. Paul bought that for the home and I used that to haul
my mulch and work outside. I have 12 acres that I mow off. And
so I use it for outside and also to check my trails. I got rid of my
four[-]wheeler when we got this because it's safer. He felt it was
safer.

Q: So you had a vehicle, a similar type vehicle, prior to this that
you used for the property?

A: I had a four[-]wheeler but it wasn't like this, it was like a
regular four[-]wheeler that—

_____

[3] In the interest of thoroughness, we note that, at the outset of Randello's testimony in this matter, Executor raised an objection to her competency as a witness under the Dead Man's Act ("Act"), 42 Pa.C.S.A. § 5930, which, generally, renders a witness incompetent to testify where: (1) the decedent has an interest in the matter at issue; (2) the interest of the witness is adverse to that of the decedent; and (3) the right of the decedent has passed to a party of record who represents the decedent's interests. **See In re Estate of Rider**, 409 A.2d 397 (Pa. 1979). The court noted the objection and permitted Randello to testify, subject to a final ruling after briefing on the issue by the parties. **See** N.T. Hearing, 6/13/19, at 44 ("I'm going to let her testify subject to your objection and if there's some kind of a[n] exception, fine, if not, it's going to be stricken."). On September 17, 2019, the Orphans' Court issued an order finding Randello competent to testify under the *devisavit vel non* exception to the Act, which provides that "witnesses are competent to testify in disputes arising over the passage of property, through will or intestacy, although their testimony might otherwise be rendered incompetent through operation of the general rule." **In re Estate of Janosky**, 827 A.2d 512, 516 n.3 (Pa. Super. 2003). As Executor has not challenged the court's ruling on appeal, we do not address its propriety herein.

Q: And did you use that to do the same thing that you did with this?

A: No, I couldn't because it didn't have the bed on the back to haul my things around. And then when I decorate at Christmas with my lights and stuff, I always load everything up in the back in that, so I don't have to run back and forth to the house.

Q: And this was purchased in 2010?

A: I believe so.

Q: [] And since that time you've been using that—

A: Yes.

Q: —at this property?

A: It's never left our property.

Q: And page 2 is a Kubota ZD331 diesel. Do you see page 2?

A: That's our lawn mower.

Q: And can you—and it looks like that was purchased in 2012?

A: Yes.

Q: And tell me how that was used?

A: We used that to mow the grass. I have a John Deere tractor and I had a bigger tractor, but I sold that when we got—we got this because it made it easier to mow the grass. With just the John Deere it would take me six and a half to seven hours. And Paul got this so then my brother helped me, and then eventually he got somebody from Heller's to come down and help me to get it done in half the time. And we still use that today.

Q: Okay. So that was used for the property?

A: Yes, ma'am.

N.T. Hearing, 12/27/19, at 4-5 (unnecessary capitalization omitted).

The court's finding that Decedent purchased the machines as a gift for Randello to replace older machines that she had previously used to maintain

her property is fully supported in the record. Accordingly, we can discern no abuse of discretion in the court's determination. **In re Fiedler**, **supra**.

Executor next claims—based again on the terms of the Agreement—that the Orphans' Court erred in finding that approximately 1,400 bottles of wine and wine racks passed by operation of law to Randello. Rather, Executor asserts that, because Decedent purchase the wine with his separate funds, both before and after the marriage, the wine and wine racks are the property of his estate. Executor also notes that Randello did not list any wine or wine racks as her own separate property on the financial disclosure attached to the Agreement, and did not identify it as "joint property" in the Stipulation. Accordingly, she has waived any claim to them.

The Orphans' Court, relying on **DiFloridio v. DiFloridio**, 331 A.2d 174 (Pa. 1975), concluded that the wine and wine racks were entireties property that passed to Randello upon Decedent's death. In **DiFloridio**, the Supreme Court of Pennsylvania disavowed the then-prevailing common-law presumption of "husband's ownership."[4] Instead, the Court held that:

---

[4] "'Husband's ownership' was inspired by the marriage entity concept existing prior to the adoption of the Married Women's Property Acts of May 23, 1887, P.L. 170 and June 8, 1893 P.L. 344 Sec. 1 (48 P.S. s 31)." **DiFloridio**, 331 A.2d at 178.

> The marriage entity concept refers to the belief that "(b)y marriage the husband and wife are one person in law.' 1 W. Blackstone Commentaries. Since the husband was considered the lord and master of his wife, all personalty acquired by her during

*(Footnote Continued Next Page)*

for the purpose of determining title of household goods and furnishings between husband and wife, the property that has been acquired in anticipation of or during marriage, and which has been possessed and used by both spouses, will, in the absence of evidence showing otherwise, be presumed to be held jointly by the entireties.

*Id.* at 180. In light of the holding in *DiFloridio*, and crediting Randello's testimony at the December 27, 2019 hearing, the Orphans' Court concluded that:

[t]hese bottles of wine were owned by the Decedent and Randello to be used for gifts or simply [to be] consumed by the parties. They were not vintage wine or collectibles. Indeed, it was a lot of wine. But these people had a lot of money and bought a lot of items for use in their house. This was wine to be consumed from time to time by the parties or their guests, [or] taken to a friend's house as a dinner or party gift. The wine was a consumable and household goods. Although there was a great deal of wine, it is a consumable like many other items that the parties may have had in their pantry or refrigerator or freezer. It was possessed and used by both parties.

Orphans' Court Opinion, 6/11/20, at 5.

Executor argues that the court's reliance on *DiFloridio* is misplaced, as the Agreement and Stipulation constitute "evidence showing otherwise," which the court failed to properly consider. Specifically, Executor asserts that the Agreement evidences both parties' intent that any property purchased

---

marriage belonged to her husband, while that acquired by the husband was solely his. *See* 102 U. of Pa. 258 (1954)[,] citing 2 F. Pollock and F. Maitland, The History of English Law, 405, 427 (2d ed. 1898) and *Du Pont v. Du Pont*, [] 98 A.2d 493, 494 ([Del. Ch.] 1953).

*Id.* at 178 n.9.

with the separate funds of either of the parties remained that party's separate property, to which the other party waived any claim. Executor refers to sections 3.02, 3.03, 3.06, and 4.04 of the Agreement, *see supra* at 1-2, and argues that

> [I]ncome generated during the marriage remains the *separate property* of the party that generated the income[.] [*See*] § 3.02. Property acquired during the marriage with the separate property of one party shall remain separate property. [*See*] § 3.03. Accordingly, property acquired during the marriage with income generated by [Decedent] remains his separate property.
>
> . . .
>
> Randello did not list any interest in any wine collection and wine racks on her Financial Statement in the [] Agreement and was clearly aware of the Decedent's wine collection at the time the [] Agreement was signed. Section 2.02 of that agreement specifically states that each party is familiar with the personal property of the other since they lived together for five years prior to the marriage. Moreover, Randello did not identify the wine as "joint property" in the [] Stipulation that was executed one month before [Decedent's] death.

Brief of Appellant, at 26-27 (emphasis in original; citation to reproduced record omitted). Executor is entitled to no relief.

We agree with Executor that the Agreement generally makes it clear that the parties intended separate property to remain separate property. However, as discussed above, the Agreement also contemplated that one party could make gifts to the other party. *See* Agreement, *supra*, at §§ 3.03, 6.05. Such was the case with the wine and wine racks.

Here, Randello testified as follows:

Q: And how did you come to have . . . this wine rack system?

A:  Every year we went to Napa Valley.  That was like Paul and [my] vacation before we went to Safari International Show.

. . .

Every year Paul and I would go to the hunting shows like Safari International.  We always book[ed] a trip to the wineries, and so we would go to different tastings and then Paul would get us into the wine clubs, we got free tastings when we went back.  And if we liked the wine[,] we would get it.

Q:  And that[] wine then was at your home?

A:  Yes.

Q:  And what did you do with the wine?

A:  We drank it, we entertained, we gave it away for gifts for Christmas, for Thanksgiving.  Our company that came over, we sent wine with them.  It was something we enjoyed together.

Q:  So you used it just the way people generally use wine when they purchase wine?

A:  I used my wine . . . the way I used my sauce at home, I make spaghetti.

N.T. Hearing, 12/27/19, at 9-10.

The court credited this testimony—which was not rebutted by Executor—and concluded that the wine was a household consumable that the parties enjoyed together and, therefore, constituted entireties property.  We agree.  Randello clearly and convincingly testified as to the parties' mutual enjoyment and use of the wine as a household good.  *In re Adoption of L.J.B.*, *supra*.  The Decedent did not purchase the wine as an investment, to be held for its intrinsic value or resold for a profit.  Rather, he purchased it to be consumed by the parties and shared with their friends and family.  While Decedent purchased the wine and wine racks with his separate funds, he did

so for the benefit of both parties. **_See In re Hillegass' Estate_**, **_supra_**; **_see also Lanning_**, **_supra_**. Thus, we conclude that the Decedent's purchase of the wine and wine racks constituted a gift of household goods to the marital unit, which passed to Randello upon Decedent's death.

We will address Executor's final two claims together, as they both concern the ownership of the Craig Bone paintings. Executor asserts that the Orphans' Court erred in finding that the paintings passed to Randello by operation of law upon Decedent's death, based solely on Randello's uncorroborated testimony that she paid Decedent for half of the purchase price, despite the fact that: (1) Randello waived any claim to Decedent's premarital property in the Agreement, and (2) the Stipulation confirmed that the paintings were not jointly held assets. Executor is entitled to no relief.

Here, Randello testified as follows regarding the parties' joint ownership of the artwork:

Q: [C]an you just describe for the [c]ourt the circumstances of the purchase of these pictures?

A: The first one is one on I think it's the left, it's called ["]The Eden.["] When Paul and I were in—at the [S]afari [I]nternational show in either Reno or Vegas, Craig Bone, we bought the painting from him.

Q: So you were together in Las Vegas when you bought this?

A: Yes. It was our first purchase that we ever bought together. I paid him cash for half of it and he used his credit card.

Q: So it's your testimony that he charged this amount. . . . So that $50,000 he paid on his card, you gave him cash for half?

A: Yes, but he doesn't carry that kind of money with him. He wouldn't have taken that kind of money with him.

Q: And where did they hang from the date of their purchase?

A: We put them in the trophy room downstairs and had an electrician do the lighting to go across it.

Q: And that was January 25th of [20]08?

A: Yes.

Q: The next page is page seven and that's—that picture is ["]Earth, Wind and Fire["]?

A: We both loved that painting and we told Craig Bone[, "I]f you're not going to give us a painting, we're not going to get those pictures.["]

Q: So you bargained for additional?

A: So he gave it to us as a gift, yes. I had a picture of Craig Bone with Paul and [me] with the painting that they painted [be]cause it was an original print.

Q: So at that—on that trip you got essentially the three paintings, two you paid for?

A: And the other one was a gift.

Q: One thrown in for part of the deal, so to speak?

A: Yes. He did that for Paul and [me], yeah. And we have a picture with him.

N.T. Hearing, 12/20/19, at 206-08.

A witness' testimony may support a finding of clear and convincing evidence if the witness is found to be credible and the evidence offered is based upon "distinct personal knowledge of the relevant facts, undecayed by time and untainted by the corrupting influences of bias or suggestion." *Matter of Larsen*, 616 A.2d 529, 532 (Pa. 1992). In this case, the Orphans' Court found Randello's testimony to be credible and concluded that the parties owned the Craig Bone artwork jointly. *See* Orphans' Court Opinion, 6/11/20,

at 4.  The court's conclusion is supported by the record.  Accordingly, the court did not err or abuse its discretion in finding that Randello was entitled to the paintings.  **See Fiedler**, **supra**.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/08/2021